Case number 21-1117, Rohan Ramsingh petitioner versus Transportation Security Administration. Mr. Corbett for the petitioner, Ms. Edwards for the respondents. Good morning, counsel. We'll hear counsel for petitioner. Good morning. May it please the court. My name is Jonathan Corbett on behalf of petitioner Rohan Ramsingh. And I wanted to elaborate on a hypothetical that I raised in our reply brief. Let's suppose you have the misfortune of severely breaking your forearm. I'm speaking of a compound fracture requiring a team of surgeons to spend hours reassembling little splinters of bone that make up your arm. They succeed and they put you in one of those fancy casts that latches shut and the doctors warn, if you take off this cast before two months goes by, there's a good chance your arm won't heal properly and you will permanently lose some use of it. Then let's say you go to a TSA checkpoint a month later, they do some initial screening, and then they say, okay, we need you to open up your cast because our secret policies say that's what's required here. One of the questions before the court is absolutely this simple. Can TSA require you to open up that cast under penalty of a maximum fine of over $13,000 or is a bona fide medical condition a defense to that fine? TSA argues they can order you to do as they please. And what evidence do we have here of a bona fide medical condition that was presented to the TSA examiner? Sure, so my client presented records from the US Veterans Administration. He presented- To the examiner on the scene. To the examiner on the scene. He didn't present documentary evidence, but he described his condition to the person on the scene. So they came up with this alternative and he objected to that as well, correct? The problem was there was no alternative. So he has- Well, I thought initially they wanted him to raise his arm. And then they said, well, we'll do a human pat down. Yeah, so he has two conditions that both resulted from his military service. The first is inability to lift his arms and hold them over his head, a physical injury. And the second is a mental health injury. He has PTSD relating to military sexual trauma. And what evidence was presented of that? To the screener or to the court? To the screener, the person who is trying to carry out the search. So my client simply told the screener of his condition. He doesn't carry around documentation from the VA of his disability or anything like that. So then his reaction was, well, I can just leave. Well, at that point they were saying, sir, you have to go through with the search. You have to let us touch your genitals. And he presented them with the option of, okay, I don't want to fly today. I'll just leave the airport. Which- On that last point about the genitals, I know you say that in your brief. That apparently never came up between the two people. Is that correct? That's not correct. My client testified that he specifically asked the scope of the search that they were going to perform. And a TSA general pat-down does include touching of the genital area using the screener's fingers. So having alerted, then what was TSA to do? So TSA had a lot of options available to it. TSA has a bunch of imaging devices, whether they're x-ray or otherwise. They have bomb sniffing dogs. They have law enforcement that could detain someone if there's reasonable suspicion. They could have transported him to a medical setting. They could have called a paramedic. There were a lot of different options. Or they could have simply said, sir, I can't let you pass today. And- And he ended up when he said, well, I'll just leave. I mean, what I don't understand about this case is this an experienced pilot, right? He's not a pilot, no. Well, he's seeking to be able to fly, right? No, ma'am. He was- That's a passenger at this point. Correct. He wasn't even a passenger. He was just going to pick up his children. Well, he wasn't even a passenger. He was coming to the airport for that purpose, as Judge Millett said. I believe that's correct. He had a gate pass to meet his children. Right. So he said he could just leave. I don't understand in that situation what TSA was supposed to do. He knew, as we all know, that when you go to the airport these days, you're going to be searched. And certainly if you alert anything, you're probably going to be subjected to what I'll call is a thorough, as opposed to a light touch, if you object to going through the machine. Well, I think my client had been through TSA many times before and hadn't been subject to the kind of search that was being proposed here. But because of whatever alert they said happened, they perhaps proposed a more intrusive search than he expected. Wait, that's not accurate. The record is clear that he had been through a pat-down once before. Yes. A pat-down that triggered severe emotional responses. Okay. I'm okay. It's your record, right? I mean, if- It's your client's story, it's your record. So I don't know why you're telling us that he hasn't been through a pat-down like this before. I don't recall the client ever saying that he had been through a pat-down where they touched his genitals before. So if the record- Well, they did, and they said that he broke down and cried and it caused severe emotional trauma for quite some time. Okay. Can I ask, you said that TSA had other options, like, I don't know, taking him into custody or whatever. You gave a list of two or three, but not on that list was simply letting him go, right? I mean, this is a situation where maybe it's unfortunate, but he tries to go through screening and he triggers a preliminary alarm. It seems to me at that point, it's just very unrealistic to think that he has a right to just walk away. Your Honor, we're not alleging that he has some kind of constitutional right to walk away. We're simply arguing that if he has a medical condition that would be triggered by what they're alleging that they would do, he doesn't have to go through with what they would do. If the TSA proposes something that would cause your arm to not heal if it was fractured, cause significant pain, whatever it is, they can't fine him for turning that down. I'm sorry, is your challenge, I mean, you just said you agree that he couldn't walk away. I'm agreeing- If they can't do the pad down and he can't walk away, what were they supposed to do? To be clear, I'm agreeing that there's no constitutional right to walk away. I'm not saying that that wasn't the best option. And in fact, that is what happened. Well, you're here to make legal arguments, not policy arguments. And so what is your position if they didn't have a constitutional right? I don't know what other kind of right he would have had to walk away. So he had no right to walk away under, there's nothing you've pointed to us in TSA policy or statute that's given him a right to walk away. So what was supposed to happen? Your Honor, unless there is a statute or regulation that forces him to remain, he does have a right to walk away. The question here is whether- Where does that right come from if it doesn't come from a statute or regulation? A right to move freely? You just said there's no constitutional right. So I'm trying to figure out the source of this right to walk away. If it's not the constitution and it's not in a statute or regulation. What I'm trying to say is the TSA could have regulated against walking away, but so far has not. If there's no regulation that says he can't, then- No, but it's quite clear. They say that once you start screening, you have to finish it. That's pretty well settled. That's on the signs when you go in. It's a security checkpoint. That doesn't make it law. But it doesn't, why does it make it unlawful? Unlawful for TSA to insist on finishing in circumstances where the initial pass-through gives them some cause for concern. Well, if they had reasonable suspicion to detain him, that would have been one thing. They could have called law enforcement, but instead they charged him with interference and he didn't interfere with anything. So TSA needs to charge here. But your theory of non-interference seems to presuppose that he can just walk away. Absent a regulation that says he can't. When he tries to walk away, if you assume that TSA at that point has to or can do something to finish the screening and make sure that the initial trigger was a false positive, he's interfering with their ability to do that if he insists on walking away at that point. And my client certainly didn't walk away without permission. He asked them for permission to walk away and remained until a law enforcement officer escorted him out. Okay. So what you say that refusal to undergo the pat-down was not interference? Correct. It wasn't interference because it was entirely passive. He didn't do anything to interfere and because he had the defense of his medical condition. You haven't raised a rehabilitation claim, right? No. You haven't independently challenged the size of the fine? It's not the size of the fine that's the issue here, no. What is the issue? The issue is that there's a fine at all, that one can be held liable for refusing to do something that might injure themselves. But if they have, let's just assume for these purposes that they have a right to require people to complete screening once they start it and particularly once they alarm, as he did. Let's just say once they alarm, they have a, just take as given for this question. They have, there's an obligation to finish screening. Now, I guess I'm still unclear what's your view of this, what should happen? Is there no defense to this obligation, a medical condition? What if one is paraplegic and they're asked to stand up? That sounds like a rehabilitation claim which you just said you haven't raised. It's, we're bringing a simple defense to a civil penalty action. Your Honor, I see my time is at three minutes. Is it possible to reserve that for rebuttal? Yes. Why don't we hear from the respondent? Thank you, Your Honor. And may it please the court, Kyle Edwards on behalf of TSA. I think it's helpful to step back briefly for a moment to consider the full set of facts underlying the issues of this particular civil penalty. Respondent regularly uses airports, a minimum of six times per year by his own admission. He's previously undergone a path down search and did find it very emotionally disturbing due to his PTSD diagnosis. On the day in question, he voluntarily entered the TSA screening checkpoint. He tried to proceed through the AIT machine, but the, sorry, through the walk-through metal detector, but the agent told him to go through the AIT screening machine. When he couldn't lift his arm due to one of his disabilities, the agent allowed him to proceed through the walk-through metal detector. And at that point there was a swab performed of his hands to test for possible traces of explosives. That test returned positive. And it was at that point after he had triggered that positive alarm that petitioner refused to complete the screening process and continued to refuse over the course of 30 minutes requiring the involvement of multiple TSA agents, as well as eventually law enforcement officers. That refusal to complete screening plainly interfered with the screener's ability to perform their screening duties because their duty at that point was to conduct a path down search of petitioner. Now petitioner has said- Have an accommodation for folks who, for reasons of disability, cannot endure a physical pat down or at least of private areas. Is there any accommodation? There is. So in this case, petitioner was offered the chance to have the pat down in a private screening area by- That's not an accommodation for people who can't endure it. Whether it happens in private or public, it's still the same physical consequence and emotional reaction and mental reaction. And so that's not an accommodation for the mental disability. That's correct. I should- So is there an accommodation for the mental, if you cannot endure a pat down because of disability? And TSA, for purpose of this case, isn't disputing the seriousness of this disability. That's correct. I mean, the answer- He has a sincere and serious disability triggered by sexual abuse, sexual trauma, and he's not going to be the only person in the country in that situation. So what accommodation does TSA have for people who simply cannot, for physical or mental health reasons, be subjected to that type of groping and examination? There is, I wouldn't describe it as groping, but there's no accommodation that would permit individuals to be exempt from the screening process. The procedure at the point- Not fully exempt. I'm not saying that they get a whole pad. Nobody wants anybody to have a pass on going through screening these days. But there are other ways of checking. Are there not? At this point, TSA's procedures were to require a pat down- I'm just asking whether they've that, so they don't have an accommodation. There is not. And that is because Congress has required the screening of all passengers and property. The accommodation is, there's a distance, there's an alternative. This isn't binary, screen or not screen. So he couldn't lift his arms for the AIT, so it wouldn't get a good shot of his arms, but that was okay. You had the metal detector. Why couldn't he have gone through the AIT just to check the groin area? So my understanding is that the procedure at this point was because he triggered that explosive trace detection test and he'd gone through the walk-through metal detector already. The walk-through metal detector tests for metallic- No, no, I'm talking about the other one, the, I think you call it the AIT, which again, it wouldn't have been a perfect screen because of the arm issue. But if the concern at this point, the only point we're talking about now, as I understand it, is the pat-down stage and the mental trauma. And so, and taking the facts in the light most favorable to him, he says that he told them, I can do a pat-down except not in the groin area. Would the AIT, would running them through the AIT at that point to examine the groin area have been a reasonable accommodation? That is not permitted under TSA's policies. What's permitted under the whole point of accommodations is that sometimes the policy can't be followed, right? Sometimes the policy can't be followed. The policy at that airport was to go through the AIT, but he couldn't. So they accommodated him because he couldn't do his arms, lift his arms, or at least one arm. And so they accommodated him by going through the metal detector. I'm not asking what their written policy is. I'm asking what their accommodation plan was for individuals who, because of sexual trauma, couldn't endure a pat-down. And they do have accommodation policies. Petitioner could have brought medical documentation explaining his- How would that have changed it? It wouldn't- If he had medical documentation that said, I have this military sexual trauma, what would have happened then? It wouldn't have changed the fact that- Okay, then it doesn't matter. It wouldn't have changed how they treat him, right? He would have still had to undergo the pat-down. Okay, so then what's the point of bringing the paperwork? The paperwork can, in terms of just explaining to a TSA agent, can help with that. That's not an accommodation. That's not an accommodation. I understand that. The thing is, is that- It sounds to me like your answer is there's no accommodation, an alternative to pat-downs. There is not. Once you trigger the explosive trace detection test after you walk through the metal detector, the procedure is to receive a pat-down. And that was offered to petitioner in a private screening area. They attempted to accommodate- Yeah, I know, but can we, I think we can agree that the location wasn't the issue of the screening was not the issue for this guy. When people have this type of trauma, that's not going to change anything. Private screening does, I think, that is an accommodation. It may help other people in other situations. It's a good thing to offer for other reasons. That's right. And I think here, I really do think that here, the petitioner was offered accommodations. He was permitted to go through the walk-through metal detector because he could not raise his arm. I'm just asking what accommodation he got for, he's got two disabilities. So take the metal detector and the arm disability off the table. That was accommodated. He was not accommodated or offered any accommodation for his sexual trauma. Apart from the private screening, there was no other alternative. And again, private screening doesn't address his trauma. The trauma is to the touching. Imagine if you had a child on the spectrum, autism spectrum, and cannot be physically handled by other people without a complete meltdown. Apologies. Children with autism regularly go through the screening process, as do people with dementia and other issues. They are permitted, like petitioner was offered here, to conduct that in private. They're permitted to have a- No, no. My hypothetical is a child. There's all different reactions for all of these diseases. So a child comes in with all the documentation, cannot mentally, in a healthy way, handle being physically touched by strangers. And will have severe, severe mental and emotional consequences if it happens. Be the exact same situation as this. Doing it in private wouldn't change that. I get that that's an accommodation for some people. It's not an accommodation for the situation here. Oh, why isn't your answer simply that it's a matter of policy he can't be allowed to enter? That's it. If he can't be searched under these accommodations, then he can't go in, period. That is absolutely the case. That is too risky. I mean, I don't know why you're hesitating No. at just taking that position. I realize you don't want to lose the case, but all I'm saying is, why isn't that the agency's position? That Congress has vested in the agency the security obligation. It has these alternatives available for people, but some people simply aren't going to be able to fly. And I'm thinking of people who as a matter of personal choice, say it's just too traumatic for them to fly. So they drive everywhere. They take trains or they don't go. I'm sorry. They don't take a ship or something, but they're not going to be allowed post 9-11 to fly on a plane. Yes. That is our position that there are certain people. Has there been a Rehabilitation Act case that has challenged this and that's been your position? So that's a little shocking to me actually, because with the Americans with Disabilities Act has an entire section on transportation and making that equally accessible to people with disabilities. And it should seem to me that while folks might not commonly want to go through this, if they have a situation like that, if the child's traveling for his grandparents' funeral in Hawaii, then there may be no other option for getting there. And it seems a rather harsh reaction to disabilities to say nothing else could be done like a drug sniffing dog or a chemical sniffing dog. It's the case here that if certain passengers cannot go through the process due to their disabilities or due to other reasons, they simply won't be able to fly. It is the case that Congress has required the screening of all passengers and property to ensure that there's no prohibited items that they get on board. TSA has been tasked with setting up regulations that- I just want to be clear here. I understand what you're saying. And so that is TSA has studied this issue about sexual trauma or for reasons or for other reasons, people can't endure a pat down and has made the decision that there is no other way to accommodate them. They are not welcome to fly in the United States of America. Those disabilities are not able to fly. They are, of course- They're not welcome. They're not welcome because your whole theory is you get in line and then you have to agree to be traumatized. So a couple of things. First, to the ADA point, there's no ADA claim here. That is something that petitioner could bring. So that is a different case, I think. No, I understand that. But I've been asking you about what the policy is. And you said to Judge Rogers, we've got a hard and fast policy, just don't fly. If you have this particular type of trauma, we have no- I'm assuming that we have studied this. We don't just reactively say there's no accommodation available. We've studied this and determined that we cannot provide any other accommodation. So I think in thinking about this, it's also important to recognize that petitioner regularly uses airports. He has been through a path down before. He said he had severe trauma. He did. Point of deep depression, then even if he says we're taking it all as true at this point to considering taking his life. He did say that. And again, the point is he voluntarily entered that TSA checkpoint. That was his choice to do so, despite knowing that he would have to go through this screening process that is paramount to the protection of aviation safety. I think choice is that this isn't someone going on a vacation, right? You know, his children are coming to visit him. Parents have to pick up children. Airlines require that. And in this particular circumstance, he arrived- What control did he have? He arrived with his girlfriend. Okay, but I'm assuming he's single and doesn't have someone else. How does he get his kids? So I just, I don't want to accept right up front that this was just a lightly made decision by him to go on a recreational trip somewhere. Sometimes people really have no choice but to go to the airport. And TSA is not in charge of the handoff of unaccompanied minors. Petitioner could have reached out to the airline itself to discuss if it was possible for him to pick up his children without entering the screening process. In this case, as I noted, his partner came with him and she was actually able to collect the children while he was still being- I'm just curious about TSA policy more generally, given the very bright lines, both adopted in the TSA decision here and that you've been articulating, which seemed to go much broader than the facts of this case. Well, again, I don't think that the position is much broader than the facts of this case, Petitioner. The facts of the case are that Petitioner has previously been through the screening process. He knew that he might be subject to a path down search. He's gone through that before and he did voluntarily enter the screening process. Do TSA regulations recognize that there are defenses to a charge of interference? And I'm unclear what counts as a defense. Sorry, can you repeat the first part of that question? The regulation 49 CFR 1503.629F4 recognizes that there are defenses to a charge of interference. Do you know what counts as a defense? I don't know. Apparently disability does not, but their theory seemed to think, they're arguing that it is a defense. And you're telling me it's just, it's not a defense, but there are other defenses? I'm not sure about that, Your Honor. Apologies. Anything further? I just want to stress the sort of importance of the government interest here. I mean, as the court noted in our archive from the Ninth Circuit, if people were able to enter the screening process, trigger a secondary screening due to possible traces of explosives, and then opt out of the screening process, that would allow potential terrorists multiple opportunities to attempt to penetrate airport security by opting out on the cusp of detection and then leaving the airport. And that is just- What about the decision to find somebody? Does everybody, how is that decision made? Does everybody that causes a kertuffle at some level end up getting one of these civil penalties? Go ahead. The civil penalty scheme. So what happens in a situation like this where law enforcement is called is that the law enforcement officers are the ones that decide whether to perform their own search of petitioner if they have reasonable suspicion, probable cause, and then decide whether to detain the person or let them go. The civil penalty scheme kicks in because TSA does not have the authority at the checkpoint to physically detain someone, the individual TSA agents. And so there's an investigation that occurs after one of these incidents. There's the inspector's report in the record here, and a determination about whether to bring a civil penalty is made based on that investigation. So this is what I'm trying to ask. So are you saying that every time police are called, then a civil penalty process- I get that the police are not TSA, that's separate, but TSA always pursues a fine? I believe when law enforcement is involved, they always institute this investigation. And then the sort of whether the fine- Do they always pursue a fine? I was just curious here about that, because I noticed he got a bigger fine than the guy who stripped down naked and required the shutdown of an entire checkpoint. He got a $500 fine. And yet the person who we are assuming for these purposes could not, because of disability, go through the pat-down, got a larger fine. I'm just trying to understand how that happened. Well, I think that the ALJ is capable of moving the fine amount. So here, TSA asked for the minimum amount, which I believe was in the range of $2,000 in terms of the guidance for what a fine should be for non-physical interference. And the ALJ, taking into account petitioner's medical condition, actually reduced that to, I believe, $680. So that sort of determination is made on a case-by-case basis. I couldn't tell you sort of why the person who stripped naked in the Brennan case was $500 versus some other amount. All right, why don't we hear from counsel for petitioner? Thank you, Your Honor. Thank you, Your Honor. So as opposing counsel has made clear, my client had two options and two options only. Option number one was to let them try and pat him down at the risk of whatever would have happened, whether he would have had a panic attack or whatever it is, or be escorted out of the checkpoint and face a fine. One of the problems here is that most of the times you go through a TSA checkpoint, you're not subject to a pat down. They're able to screen you using their machines and you go forward. So if you have a disability or some other reason that you can't be patted down, you can go through the airport nine out of 10 times, perhaps, and not end up patted down. But that one time that you can't and you end up with the pat down, TSA wants to issue a fine with a maximum penalty of up to $13,000. You're off with that choice of trying and you'll probably get through, but maybe you'll face a fine. It's not right. And TSA points to this idea that if they don't fine people, then terrorists will get multiple attempts. Fines aren't dissuading terrorists. If you're set on bombing an airplane and you try once and you're rejected and go home, don't care if you're issued a fine. All this is doing is penalizing law-abiding citizens with disabilities who simply cannot complete the screening that TSA has demanded. And there is no opt-out. There is no alternative. There is no accommodation. Once they've decided a pat down is necessary, you either accept it, or apparently you have to go through this whole process. Okay, we'll take the case under advisement. Thank you very much, counsel.
judges: Rogers, Millett, Katsas